1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                 FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11   In re DEEP VEIN THROMBOSIS            MDL Docket No 04-1606 VRW
     LITIGATION
12                                                   ORDER

13   This Document Relates To:

14   Dabulis v Singapore Airlines,
     Inc, No 03-1929
15
     Rietchel v US Airways, Inc, No
16   01-3444

17   Braha v Delta Airlines, Inc, No
     05-1544
18
     Bianchetti v Delta Airlines, Inc,
19   No 04-4860

20   Halterman v Delta Airlines, Inc,
     No 04-3953
21

22   _____/

23           Deep vein thrombosis (DVT) is a medical condition that

24   occurs when a thrombus (a blood clot) forms in a deep vein, usually

25   in the extremities of the leg.  DVT can lead to serious injury or

26   death if the thrombus breaks off and lodges in the brain, lungs or

27   heart, thereby causing a heart attack, stroke or other debilitating

28   effects.  Studies indicate a link between air travel and DVT, which

can be attributed to relatively prolonged periods of immobility coupled with low cabin pressure and poor oxygenation (technically, "hypobaric hypoxia").  Plaintiffs in this litigation suffered (or sue on behalf of an individual who suffered) from DVT-related injuries during or after travel aboard commercial aircraft.

On June 25, 2004, the Judicial Panel on Multidistrict Litigation centralized pre-trial proceedings in cases involving "complex core questions concerning whether various aspects of airline travel cause, or contribute to, the development of deep vein thrombosis in airline passengers."  Doc #1 at 2.  Ultimately, all transferred actions were assigned to the undersigned.  On February 14, 2005, the court granted summary judgment in favor of Boeing in its capacity as manufacturer of the aircraft in question in 17 cases.  Doc #144, 356 F Supp 2d 1055 (ND Cal 2005).  All claims against airline defendants arising from domestic flights ("non-Warsaw cases") were dismissed pursuant to the federal preemption rationale announced in the court's order of March 11, 2005.  Doc #151, 2005 WL 591241 (ND Cal Mar 11, 2005).  Plaintiffs appealed.  On October 4, 2007, the Ninth Circuit affirmed in part, finding that the failure to warn claims were preempted by the Federal Aviation Act of 1958, 49 USC § 40103.  <u>Montalvo v Spirit Airlines</u>, -- F3d – (9th Cir 2007).  But the Ninth Circuit remanded plaintiffs' seating configuration claim for further factual development.  Specifically, the panel found insufficient evidence on which to evaluate whether a seat reconfiguration would materially impact federal deregulation, which is a prerequisite for preemption under the Airline Deregulation Act of 1978, 49 USC § 41713(b)(1).  Id.

**United States District Court**
For the Northern District of California

1    MDL 1606 included approximately 50 cases in which

2    plaintiffs alleged that they suffered from DVT-related injuries

3    during or after international flights ("Warsaw cases").  On August

4    21, 2006, the court granted summary judgment in 37 Warsaw cases in

5    which plaintiffs alleged liability based on asserted failure to

6    warn regarding DVT.  Doc #469, 2006 WL 2547459 (ND Cal Aug 21,

7    2006).  See also Caman v Continental Airlines, 455 F3d 1087 (9th

8    Cir 2006).  The court directed entry of summary judgment under FRCP

9    54(b) in favor of any airline defendant against which the only

10   Warsaw Convention accidents alleged were "the onset of DVT or the

11   absence or insufficiency of a warning regarding DVT or policy level

12   decisions regarding the same."  Id.

13       The following Warsaw Convention DVT cases remain in MDL

14   1606:

15       Rietchel v US Airways, Inc, No 01-3444
         Dabulis v Singapore Airlines, Inc, No 03-1929
16       Richelet v Lufthansa German Airlines, No 04-3831
         Bianchetti v Delta Airlines, Inc, No 04-4860
17       Braha v Delta Airlines, Inc, No 05-1544
         Vincent v American Airlines, Inc, No 07-1604
18
19   These are cases in which plaintiffs make "failure to warn" claims

20   in addition to other claims.  On December 4, 2006, the court

21   granted partial summary judgment for the airline defendants on the

22   failure to warn claims for the reasons announced in the court's

23   August 21, 2006 order.  Doc #528.

24       At the May 1, 2007 case management conference, the court

25   extended the discovery deadline to June 1, 2007.  Doc #588.  The

26   court instructed plaintiffs to make an FRCP 56(f) request in the

27   event they believed that additional discovery was necessary

28   subsequent to June 1, 2007.  Id.  On August 6, 2007, the court

United States District Court
For the Northern District of California

received a letter from counsel for plaintiffs in 01-3444 and 05-1544 requesting a telephonic conference to resolve pending discovery disputes.  The court denied counsel's request and re-iterated that, to the extent plaintiffs believed that further discovery was necessary, they were to make a request pursuant to FRCP 56(f).  Doc #655.

Presently before the court are the following: (1) defendant Singapore Airlines, Inc's motion for summary judgment in the <u>Dabulis</u> case (Doc #37, 03-1929); (2) defendant Delta Airlines, Inc's motion for summary judgment in the <u>Braha</u> case (Doc #27, 05-1544); (3) defendant US Airways, Inc's motion for summary judgment in the <u>Rietschel</u> case (01-3444, filed as Doc #645 in 04-1606); and (4) defendant Delta Airlines, Inc's motion for summary judgment in the <u>Bianchetti</u> case (Doc #37, 04-4860).  The court takes up these motions in turn, following a summary of the governing legal landscape.

I

A

"Once a properly documented motion has engaged the gears of Rule 56, the party to whom the motion is directed can shut down the machinery only by showing that a trialworthy issue exists." <u>McCarthy v Northwest Airlines, Inc</u>, 56 F3d 313, 315 (1st Cir 1995). That is, the court must determine whether genuine issues of material fact exist, resolving any doubt in favor of the party opposing the motion.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Anderson v Liberty Lobby,</u>

**United States District Court**

For the Northern District of California

*Inc*, 477 US 242, 248 (1986).  Further, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.  And the burden of establishing the absence of a genuine issue of material fact lies with the moving party.  *Celotex Corp v Catrett*, 477 US 317, 322-23 (1986).  Summary judgment is granted only if the moving party is entitled to judgment as a matter of law.  FRCP 56(c).

The nonmoving party may not simply rely on the pleadings, however, but must produce significant probative evidence, by affidavit or as otherwise provided in FRCP 56, supporting its claim that a genuine issue of material fact exists.  *TW Elec Serv, Inc v Pacific Elec Contractors Ass'n*, 809 F2d 626, 630 (9th Cir 1987).  Summary judgment is appropriate when the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex* at 322.  The evidence presented by the nonmoving party "is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson*, 477 US at 255.  "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Id at 249.

The evidence presented by both parties must be admissible.  FRCP 56(e).  Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment.  *Thornhill Publishing Co, Inc v GTE Corp*, 594 F2d 730, 738 (9th Cir 1979).  Hearsay \\

statements in affidavits are inadmissible.  <u>Japan Telecom, Inc v</u>

<u>Japan Telecom America Inc</u>, 287 F3d 866, 875 n 1 (9th Cir 2004).

<div align="center">B</div>

The United States adheres to the Convention for the

Unification of Certain Rules Relating to International

Transportation by Air, concluded at Warsaw, Poland, October 12,

1929, popularly referred to as the "Warsaw Convention."  49 Stat

3000, reprinted in note following 49 USC § 40105.  The purposes of

the Warsaw Convention are two-fold:  "providing uniformity in

respect to documentation and certain procedural matters, and

imposing limitations on liability."  <u>In re Aircrash in Bali,</u>

<u>Indonesia on April 22, 1974</u>, 684 F2d 1301, 1307 (9th Cir 1982).

See also <u>Maugnie v Compagnie Nationale Air France</u>, 549 F2d 1256,

1259 (9th Cir 1977) ("[T]he Convention functions to protect

passengers from the hazards of air travel and also spreads the

accident cost of air transportation among all passengers.")

"[R]ecovery for a personal injury suffered on board an

aircraft or in the course of embarking or disembarking, if not

allowed under the Convention, is not available at all."  <u>El Al</u>

<u>Israel Airlines, Ltd v Tseng</u>, 525 US 155, 161 (1999) (quotations

and citation omitted).  The remaining MDL plaintiffs do not dispute

that the injuries they sustained (DVT and resultant complications)

were triggered during "international transportation" for purposes

of Article 1(2).  Nor do plaintiffs dispute that the Warsaw

Convention applies and preempts all claims arising under local law.

Accordingly, plaintiffs can recover from the airline defendants, if

at all, only within the framework established by the Warsaw

Convention.

<div align="center">6</div>

United States District Court

For the Northern District of California

**United States District Court**
For the Northern District of California

Article 17 of the Warsaw Convention provides:

The carrier shall be liable for damage sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger, if the <u>accident</u> which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking.

49 Stat 3018 (emphasis added).

In other words, as explained by the Supreme Court in <u>Air France v Saks</u>, 470 US 392 (1985), a carrier "is liable to a passenger under the terms of the Warsaw Convention only if the passenger proves that an 'accident' was the cause of her injury." Id at 396. In <u>Saks</u>, the Supreme Court defined "accident" for purposes of Article 17 as "an unexpected or unusual event or happening that is external to the passenger." Id at 405. "This definition should be flexibly applied after assessment of all the circumstances surrounding a passenger's injuries." Id. And because any injury "is the product of a chain of causes," a plaintiff need only show that "some link in the chain was an unusual or unexpected event external to the passenger." Id at 406.

When, however, "the injury indisputably results from the passenger's own internal reaction to the usual, normal, and expected operation of the aircraft, it has not been caused by an accident, and Article 17 of the Warsaw Convention cannot apply." Id. And because DVT "clearly is the type of internal reaction to the normal operation of the aircraft, with no unusual external event," the development of DVT is not itself an accident within the meaning of Article 17. <u>Rodriguez v Ansett Australia Ltd</u>, 383 F3d 914, 917 (9th Cir 2004), cert denied, 544 US 922 (2005). But DVT-related injuries may be compensable under the Warsaw Convention if

7

caused by an Article 17 accident. With these principles in mind, the court proceeds to the summary judgment motions at bar.

<div align="center">

II

*Dabulis v Singapore Airlines Limited, No 03-1929*

A

</div>

On or about May 18, 2001, Marsha Dabulis ("Dabulis") was a fare-paying passenger on Singapore Airlines Flight 26 (SQ26) from Singapore to New York, with a stop in Frankfurt, Germany. Complaint, Doc #1-1 ¶5; Doc #47, Ex B ¶2. Dabulis was assigned to a middle seat with the number 56F. Doc #47, Ex B ¶3.

In her declaration, Dabulis states that her seat was "very, very cramped, more than [she had] ever seen on any other international flight." Id ¶4. Dabulis also states that her seat was unlike the other seats in that:

> directly in front of me there was a vertical metal bar appearing to be supporting or connecting to the seat directly in front, so it totally blocked access by my feet or legs to what should have been some space in front of me and under the seat. This made for even more severly [sic] cramped space and prevented any stretching of my legs completely. It was difficult to move at all. * * * The presence of the metal bar [was] awkwardly placed and so I had to put my feet around it or beside it in order to be comfortable. Although I am only 5 foot, 3 inches tall, and weighed at the time only 110 pounds, I felt extremely cramped, uncomfortable and in pain.

Id ¶¶4-5. During her deposition, Dabulis reviewed pictures of the seat and drew an "X" over the metal bar. Doc #37 at 17. These pictures were submitted as exhibit A to docket #38 and exhibit D to docket #47. Dabulis estimates that the bar was 8.5 inches long. Doc #47, Ex C ¶7. SIA submits a declaration from one of its technical services engineers, Jacelyn Chng. Doc #38. While Ms

**United States District Court**
For the Northern District of California

<div align="center">8</div>

United States District Court

For the Northern District of California

Chng states that the "metal support frame" identified by Dabulis is "a standard part of the seat frame," id at ¶12, Ms Chng's declaration is silent whether the positioning of this metal "bar" or "support frame" was also "standard."  Dabulis states that, in the two years prior to this incident, she had flown on Singapore Airlines between Asia and New York on at least 8 flights (4 round trip flights).  Doc #47, Ex C ¶5.  The vertical bar that she encountered on SQ26 was not present on any of Dabulis' previous flights.  Id.  Even on SQ26 itself, Dabulis states that none of the other seats had a metal bar blocking their leg room.  Doc #37, Ex C at 29:16-17.

During the first part of the flight (Singapore to Frankfurt), Dabulis started experiencing pain in her left leg.  Id at 45, 60.  Her leg was "swollen" and "throbbing."  Id.  Dabulis continued to experience pain in her leg after the layover, during the flight from Frankfurt to New York.  Id at 55.  She recalls her leg being "swollen" and having a "nagging pain" and a "pulling pain."  Id.

During both "legs" of the flight, Dabulis asked to be moved to a different seat:

> At one point during the first leg of the flight, I requested of a member of the flight crew to provide me with a different seat, complaining of the pain which had become a great concern to me.  I informed her that I was in pain, my leg was swollen and that I could hardly walk.  She informed me that there was no other available seating on the plane and instructed me to return to my seat. * * * After the layover and before the second leg of the flight, a member of the flight crew informed me that in fact there was another seat in economy class on the left side of the plane near the lavatory, which was available, but that seat did not recline and it did not allow me to recline and stretch out.  Moreover, by that time, the pain in my left calf had become severe, and I thought the first seat was better because it allowed me to recline.

1    Id ¶6.  See also Doc #37, Ex C (Dabulis dep) at 45, 48-51, 54-55,

2    59-60.

3         SIA does not dispute Dabulis' recital of the events

4    onboard SQ26.  Moreover, SIA's discovery responses show that there

5    were available seats on the flight.  See Doc #47, Ex B, SIA's

6    Response to Plaintiff's Request for Admission No 1 (Request: "Admit

7    that the subject flight had empty seats." Response: "SIA states

8    that there were passenger seats on the subject flight that were not

9    assigned." (objections omitted)).

10        Dabulis arrived in New York on Friday, May 19, 2001.  Doc

11   #37, Ex C at 60:21.  She spent the weekend in bed and called a

12   doctor's office on Monday.  Id at 60:25-61:2.  Dabulis states that,

13   after describing her symptoms and the flight to a nurse, Dabulis

14   was instructed to go to the emergency room immediately.  Id at

15   61:7-21.  Dabulis complied, and the emergency room doctors

16   diagnosed Dabulis with a DVT.  Id at 61:22-63:8.  The hospital

17   admitted Dabulis as an inpatient for seven days.  Id at 63:9-13.

18   Dabulis returned to the hospital for several weeks due to extensive

19   bleeding, and she had to undergo a thrombectomy a year after the

20   incident.  Doc #47, Ex C ¶15.

21                              B

22        Dabulis states that her case is premised on one and only

23   one Warsaw Convention "accident," namely the flight attendant's

24   refusal to reseat her.  Doc #48 at 4, 8.  Although Dabulis states

25   that the metal bar in front of her seat was "unexpected and

26   unusual," doc #47, ex C ¶5, Dabulis does not base an accident claim

27   on her seat or any alleged defect in the seat.  Doc #48 at 11.

28   \\

**United States District Court**
For the Northern District of California

10

United States District Court
For the Northern District of California

SIA argues that Dabulis cannot prove that the alleged failure to reseat her qualifies as a Warsaw Convention "accident." Doc #37 at 18-19.  Alternatively, SIA argues that Dabulis cannot prove that her DVT was caused by the refusal to reseat her.  Id at 20.  On both fronts, the court disagrees.

1

The case most relevant to whether SIA's alleged failure to reseat Dabulis could qualify as a Warsaw Convention "accident" is Olympic Airways v Husain, 316 F3d 829 (9th Cir 2002).  Husain involved a passenger's fatal reaction to cigarette smoke in the aircraft cabin.  Upon boarding the flight, Dr Hanson and his wife, plaintiff Rubina Husain, realized their seats were located near the economy-class smoking section.  Given Hanson's history of recurrent anaphylactic reactions to cigarette smoke, Husain notified a flight attendant that Hanson was allergic to smoke and requested that Hanson be reseated further away from the smoking area.  Husain repeated her request several times to no avail.  Hanson died in flight, apparently due to a reaction to the ambient cigarette smoke.  Husain's lawsuit followed.

Judge Breyer of this district held that the flight attendant's refusal to reseat Hanson constituted an Article 17 accident because it was in "blatant disregard of industry standards and airline policies" and therefore "unexpected or unusual" under Saks.  116 F Supp 2d 1121, 1134 (ND Cal 2000).  The Ninth Circuit affirmed, agreeing that the refusal to reseat Hanson "was unexpected and unusual in light of industry standards, Olympic policy, and the simple nature of Dr Hanson's requested accommodation."  316 F3d 829, 837 (9th Cir 2002).

United States District Court
For the Northern District of California

A similar holding was reached in <u>McCaskey v Continental Airlines, Inc</u>, 159 F Supp 2d 562, 574 (SD Tex 2001).  In <u>McCaskey</u>, the Southern District of Texas denied an airlines' motion for summary judgment finding genuine issues of material fact whether alleged rude behavior of airline staff, failure to divert the plane after a passenger suffered a stroke or improper training of flight crew for handling medical emergencies constituted an "accident." <u>McCaskey</u> involved a case brought by a passenger's wife claiming that these alleged accidents (among others not relevant to this case) caused or exacerbated the passenger's stroke.

Saks requires that the definition of "accident" be flexibly applied after "assessment of all the circumstances surrounding a passenger's injuries."  <u>Saks</u>, 470 US at 405.  As shown above, SIA admits that there were other available seats on the flight.  Dabulis shows and SIA admits that SIA failed to reseat Dabulis at all during the first leg of the flight.  Dabulis also shows, and SIA does not dispute, that the seat offered to Dabulis during the second leg of the flight was another economy class seat that did not recline but there were still other seats (that presumably did recline) available to re-seat Dabulis.  Finally, Dabulis points out, and SIA admits, that SIA was aware of the risks of DVT associated with prolonged immobility on aircraft.  Doc #37, Ex E ¶9; Doc #48 at 14-16.  Based on these facts, a reasonable jury could find that SIA's refusal to reseat Dabulis was an "unexpected or unusual" event, sufficient to qualify as an Article 17 accident.

In its reply, SIA makes three half-hearted attempts at distinguishing <u>Husain</u>.  First, SIA argues that "unlike here, Dr Hanson [the passenger in <u>Husain</u>] was never offered an alternate

**United States District Court**
For the Northern District of California

seat." Doc #49 at 10.  But the idea that SIA somehow discharged its duty by offering Dabulis a seat that was even more restrictive than her original seat is hardly beyond dispute.  As Dabulis points out, the alternate passenger seat offered by SIA was akin to offering Dr Hanson a different seat in the smoking section of his aircraft.  SIA submits no evidence that other, more appropriate, seats were unavailable.  Even if the non-reclining seat was the only empty seat, SIA submits no evidence that the crew could not have attempted to entice other passengers to switch their seats.

SIA next argues that "unlike here, Dr Hanson's request to be reseated [in Husain] was based upon a known medical necessity." Doc #49 at 11.  The court disagrees.  As shown above, Dabulis has submitted evidence that she believed she was experiencing a medical emergency and she made this known to the flight crew.  If SIA's argument is that Dabulis needed to know her specific medical condition, the court does not see the significance of this point. There is none.

Finally, SIA argues that "unlike here, Ms Husain offered evidence that an industry standard and an airline procedure had been violated." Doc #49 at 12.  It is true that the district court in Husain relied heavily on evidence of the standard of care for flight attendants.  Husain, 116 F Supp 2d at 1132.  But Husain involved a decision following bench trial, at which plaintiff bore the burden of proof.  Here, SIA moves for summary judgment and therefore carries the burden.  SIA offers no evidence that the industry standard calls for something other than accommodating a passenger who indicates that she needs to be moved for medical

reasons.  Accordingly, SIA's argument is unavailing for purposes of this motion.

<div align="center">2</div>

Alternatively, SIA argues that Dabulis cannot prove that the alleged refusal to reseat her caused her DVT.  Doc #37 at 20. The court disagrees.  As shown above, Dabulis began experiencing pain in her left leg during the first part of her flight and identified the cramped seating and restricted leg room as the problem.  Dabulis communicated this issue to the flight crew more than once.  The crew failed to provide Dabulis a seat that would allow her to stretch her legs, and the problem persisted.  Dabulis continued to experience pain in the days immediately following the flight, and she was diagnosed with a DVT on the third day after landing.  A reasonable jury could find, based on this evidence, that SIA's refusal to reseat Dabulis was a causal factor in the development of her DVT.

SIA makes much of the fact that Dabulis testified in deposition that she possessed factors possibly predisposing her to DVT, for example low blood pressure, varicose veins and a family history of phlebitis.  Doc #37 at 24.  But as Dabulis points out, it is not necessary for plaintiff to show that the alleged "accident" was the exclusive cause of her injury.  "Any injury is the product of a chain of causes, and we require only that the passenger be able to prove that some link in the chain was an unusual or unexpected event external to the passenger."  Saks at 406.  Again, based on the discussion above, Dabulis has submitted sufficient evidence to make this showing.

\\

<div align="left">United States District Court<br>For the Northern District of California</div>

<div align="center">14</div>

C

Based on the foregoing, a reasonable jury could find that SIA refused to reseat Dabulis, that this refusal was an unusual or unexpected event constituting an Article 17 "accident" and that this refusal was a causal link in Dabulis' development of DVT. Accordingly, SIA's motion for summary judgment is DENIED. Because the court does not rely on any of the exhibits addressed in SIA's evidentiary objections, doc #50, the objections are MOOT and DENIED.

III

*Braha v Delta Airlines, Inc,* No 05-1544

A

This case is brought by Gilberto Braha ("plaintiff") individually and on behalf of his deceased wife, Iardenyth Tito Braha ("Ms Braha").

1

On August 25, 2003, Ms Braha purchased a ticket for economy class, round-trip travel between Rome, Italy and San Francisco on Delta Airlines ("Delta").  Doc #28, Ex C.  Using this ticket, on September 11, 2003, Ms Braha flew aboard Delta Flight 71 from Rome to Atlanta, and on Delta Flight 305 from Atlanta to San Francisco.  Id.  Ms Braha left the United States to return to Italy on September 23, 2003, taking Delta Flight 310 from San Francisco to New York and Delta Flight 148 from New York to Rome.  Id.  The allegations in plaintiff's complaint arise from Ms Braha's return flight.  See Doc #4 ¶8.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

According to plaintiff, upon her arrival in Rome, Ms Braha was greeted by the couple's son and driven to their home located about 30 minutes from the airport.  Doc #28, Ex A (Gilberto Braha dep) at 50:5-21, 52:1-3.  Ms Braha was home for only "[a] few hours" - "[t]wo or three hours" - before she set off by car for their mountain house in Rocca Sinibalda, approximately 75 minutes away.  Id at 51:4-17, 52:4-6.  While at home, and before leaving for Rocca Siniblada, Ms Braha unpacked and gave instructions to the housekeepers.  Id at 52:7-12.

At the time, plaintiff thought his wife appeared tired, but he could not recall any other evidence of distress or medical problems.  Nor could he say that she appeared any more tired than after other, similar international flights.  Id at 68:10-69:3. Plaintiff believed that his wife was eager to get to the mountains to relax.  Id at 69:4-10.  After Ms Braha arrived at the mountain home, plaintiff had two phone conversations with her, each lasting a few minutes.  Id at 67:22-68:3.  They discussed "the weather or how she found the plants and trees and gardens and so on."  Id at 68:4-6.  Ms Braha did not complain about how she was feeling.  Id at 68:7-9.

The next morning, September 25, 2003, Ms Braha died.  Doc #28, Exs D-E.  According to plaintiff, shortly before her death, in the company of family friend Francesco Rinaldi, Ms Braha was "having coffee and the - all of a sudden she felt sick."  Doc #28, Ex A (plaintiff dep) at 73:3-12.  Mr Rinaldi is reported to have told the police who investigated the death that "[a]fter having set up the coffee [machine], we continued the conversation.  That is when I noticed that while she was lying on the bed, she stiffened,

contorting the arms, which were hanging forward, and the mouth, while emitting guttural sounds * * *."  Doc #28, Exs D-E.

The forensic examination report concludes that Ms Braha died at 8:30am on September 25, 2003 and that:

[i]n summary, in view of the documentation of the certificates and the necroscopic examination, it is possible to state that the death of TITO Lardenyth was caused by sudden cardiac death due to malignant arrhythmia in the subject with chronic ischemic cardiopathy and hypertrophy of the ventriculus sinister.  The death having been determined by sickness, is thus due to natural causes.  No death elements have been determined that could be linked to a violent cause.  In particular, the sequestered substances do not determine toxicity, neither acute nor chronic, and thus cannot be considered causal or concausal elements of the death of TITO Larendyth.

Doc #28, Exs D-E.

2

What little Ms Braha told her husband about her trip from the United States to Italy consisted of the following:

- "I only recall that when she came back she complained that she had a terrible flight."  Doc #28, Ex A (Gilberto Braha dep) at 49:21-25.
- Ms Braha said "she had a very difficult flight because she was squeezed."  Id at 50:1-4.
- "[S]he said simply she had a terrible flight and she was squeezed and she couldn't move."  Id at 52:21-53:1.
- "[S]he said, you know, she felt uncomfortable."  Id at 53:10-13.
- "[S]he said she was very happy to be back home because she has - she's had a bad flight."  Id at 57:4-8.
- "She told me she couldn't move, but I don't know why."  Id at 100:4-9.

Though Ms Braha was not specific, and plaintiff did not know for sure, plaintiff believed that his wife's statements referred to the last leg of the journey - the flight from New York to Rome.  Id at 53:5-9.  Ms Braha reportedly told plaintiff that "[i]t was a very full flight."  Id at 107:14-20.  Plaintiff has no information that the economy class seats were inadequate or

**United States District Court**
For the Northern District of California

1  improperly maintained.  Id at 106:21-107:1.  Ms Braha merely stated

2  that she felt "squeezed," which he "guessed" meant "that she was

3  between two passengers."  Id at 57:15-25.

4       Plaintiff also testified in deposition that Ms Braha

5  "mentioned also about turbulence that they had strong turbulence."

6  Id at 53:17-20.  From his own experience, plaintiff recognized that

7  turbulence is something "normally you encounter during your

8  flights."  Id at 53:23-54:8.  Because of this, he could only

9  "presume" she was referring to some sort of turbulence that was

10  "exceptional."  Id at 53:23-54:8, 99:14-20.  But Ms Braha never

11  told plaintiff that the captain ordered everyone to be seated

12  during the flight or that any services had to be discontinued due

13  to turbulence.  Id at 54:9-15.

14       While the facts recited in this section are taken from

15  excerpts of plaintiff's deposition as submitted by Delta, plaintiff

16  does not dispute Delta's characterization that the couple's

17  conversation regarding the flight was limited to this handful of

18  vague statements.  Doc #27 at 8-10.  Nor does plaintiff show that

19  he possesses additional information about the flight.

20                              3

21       Plaintiff filed his complaint in this action on April 14,

22  2005.  Doc #2.  Although Ms Braha's two children were originally

23  named as plaintiffs along with Mr Braha, the children stipulated to

24  dismiss their claims with prejudice, and the stipulation was

25  entered by this court on May 1, 2007.  Doc #20.

26       In addition to failure to warn clams, which have already

27  been dismissed, plaintiff alleges that Ms Braha experienced

28  "irregular altitude, inadequate air circulation and oxygenation,

                              18

United States District Court

For the Northern District of California

inadequate pressurization within the cabin due to a faulty and abnormal pressurization system(s), turbulence, cramped seating, inadequate hydration, and/or other unexpected and/or unusual factors * * *." Doc #4 ¶9.  The court notes that these allegations are virtually identical to the allegations of other DVT plaintiffs represented by the same counsel as plaintiff here.  See e g Doc #4 ¶9 in <u>Halterman v Delta</u>, 04-3953; Doc #55 ¶8 in <u>Rietchel v US Airways</u>, 01-3444.

<center>B</center>

Delta argues in its motion for summary judgment that plaintiff is unable to prove that an "accident" occurred onboard Ms Braha's international return flight, Flight 148.  Specifically, Delta goes down plaintiff's list of allegations, showing that each one lacks evidentiary support.  Doc #27 at 12-18.  In opposition, plaintiff produces nothing to contradict Delta's proof that there is no evidence of irregular altitude, inadequate air circulation and oxygenation, inadequate pressurization, cramped or defective seating, inadequate hydration, prolonged immobility, delay, failure to inspect the aircraft, failure to maintain the aircraft or negligence.  Doc #658.  Rather, plaintiff stakes his whole claim on alleged turbulence.  Id at 11-14.  Plaintiff's argument fails on several grounds.

<center>1</center>

First, the only evidence that plaintiff relies on for his turbulence claim are Ms Braha's vague statements that there was turbulence during her flight.  Doc #658 at 11-12.  Specifically, plaintiff testified in deposition as follows:

\\

<center>19</center>

**United States District Court**

For the Northern District of California

> – "She was squeezed and she mentioned also about turbulence that they had strong turbulence."  Doc #657, Ex K at 53:19-20.
>
> – "She was tired because of the, you know, the – she told me about the flight and the turbulence that happened and that she had a difficult flight."  Id at 68:18-20.
>
> – "As I told you, she spoke about the turbulence."  Id at 107:6.

These statements, standing alone, are far from sufficient for a reasonable jury to conclude that Ms Braha suffered an accident.

Moreover, as Delta points out, Ms Braha's statements are hearsay.  Doc #27 at 7.  FRE 804 sets out those exceptions to the hearsay rule that may apply when a hearsay declarant is deceased or otherwise unavailable to testify.  These are (1) former testimony, (2) a statement under belief of impending death, (3) a statement against interest, (4) a statement of personal or family history and (5) a statement offered against a party that engaged in wrongdoing that was intended to and did procure the unavailability of the declarant.  None of these exceptions applies here, and plaintiff does not argue otherwise.  Instead, plaintiff points to the non-controversial rule that, on a summary judgment motion, all inferences are to be drawn in favor of the non-moving party.  Doc #658 at 12.  This presumption does not discharge plaintiff of his burden to present admissible evidence to defeat such motion.  FRCP 56(e).  Plaintiff fails to do so.

2

Next, Delta submits affirmative evidence that there was no such "strong turbulence."  Specifically, Delta's records show that the pilots on the flight from San Francisco to New York reported the flight as "smooth" at "two documented recording points."  Doc #30 ¶7.  The flight from New York to Rome was never

20

reported to have experienced anything more than occasional "light chop," which is the "lightest category" of turbulence.   Id ¶¶11, 15.   Plaintiff does not address this proof, let alone rebut it.

3

Finally, plaintiff's theory is not that turbulence led to some direct impact causing Ms Braha's injury.   Rather, plaintiff argues that the alleged turbulence forced Ms Braha to remain seated, thereby forming a link in the chain of causes leading to Ms Braha's injury.   Doc #658 at 12-13.   The problem with this argument is that plaintiff offers no evidence that Ms Braha was forced to remain seated.   Plaintiff specifically testified that Ms Braha never told him that passengers were instructed to remain seated because of turbulence.   Doc #28, Ex A at 54:9-11.

Moreover, this is the identical theory offered by plaintiff in <u>Halterman v Delta Airlines, Inc, Qantas Airways, Limited and Skywest, Inc</u>, No 04-3953, who, it is worth noting, was represented by the same counsel as plaintiff here.   The court rejected the theory in its July 10, 2007 order granting summary judgment for defendant Qantas in that case.   Doc #628.   As stated in the <u>Halterman</u> order:

> Here it is not Halterman's contention that atypical turbulence caused direct impact or other trauma to his leg.   Rather, Halterman claims that the turbulence should constitute an "accident" because it forced him to remain seated.   This is, to say the least, a strained theory, * * * Halterman's alleged "accident" is, in effect, "prolonged" sitting.

Id at 18-19.   In <u>Halterman</u>, as here, plaintiff's theory was a transparent effort to force plaintiff's injuries into the category of those compensable under the Warsaw Convention.   Acknowledging case law holding that prolonged sitting does not constitute an

United States District Court

For the Northern District of California

Article 17 accident, plaintiff pointed to turbulence as a link in the chain causing prolonged sitting.  But plaintiff's use of the "link in the chain" language of Saks conflates the accident prong with the causation prong of Warsaw Convention liability.  "Any injury is the product of a *chain of causes*, and we require only that the passenger be able to prove that some link in the chain was an unusual or unexpected event external to the passenger.  Until Article 17 of the Warsaw Convention is changed by the signatories, it cannot be stretched to impose carrier liability for injuries that are not *caused by* accidents."  Saks at 406 (emphasis added).  The "link in the chain" language of Saks does not invite a plaintiff to string a series of "non-accidents" or "almost-accidents" together to form an accident.  Saks provides a clear definition of accident: "an unexpected or unusual event or happening that is external to the passenger."  Saks at 405.  This definition is to be "flexibly applied after assessment of all the circumstances surrounding a passenger's injuries."  Id.

Applying that definition here, it cannot be unexpected or unusual that there will be periods of a flight during which a passenger is required to remain in his or her seat due to turbulence.  And it cannot have been the intent of the Warsaw Convention that such basic safety precautions create liability for airlines.  To the contrary, these safety precautions are intended to prevent the type of "accidents" that would expose airlines to liability.  Cf Saks v Air France, 724 F2d 1383, 1389-90 (9th Cir 1984) (Wallace, J, dissenting), rev'd, 470 US 392 (1985) (intent of the Warsaw Convention was not to make carriers insurers of their passengers' well-being, but to create incentives for safe and

economical air travel).  Having failed to identify an accident,
there is no need to look to the chain of causes leading to Ms
Braha's injury.  A qualifying accident would first have to be shown
to occupy a link in that chain.

<center>C</center>

Even assuming that plaintiff could prove an accident, and
there is no showing that he could, summary judgment would still be
warranted precisely because plaintiff fails to establish the
aforementioned causation.  Specifically, plaintiff has failed to
produce any evidence that Ms Braha's death was caused by events
onboard Ms Braha's flights, accident or otherwise.  The only
evidence relating to the cause of Ms Braha's death, the autopsy
report, is silent on the issue of Ms Braha's travel.  The temporal
proximity between the flight and Ms Braha's death (if indeed that
is plaintiff's theory) does not, standing alone, suffice for a
reasonable jury to find causation.

Worse yet, plaintiff does not even provide evidence that
his wife died as a result of DVT or that his wife even had a DVT.
Plaintiff filed a complaint alleging that "[a] few hours after
deplaning, decedent died as a result of complications due to or
related to Deep Vein Thrombosis (DVT) and/or Pulmonary Embolism
(PE) injury."  Doc #4 ¶8.  Plaintiff offers no evidence to support
this allegation.  And plaintiff does not dispute Delta's assertion
that the autopsy report attributes the death to "malignant
arrhythmia * * * with chronic ischemic cardiopathy and hypertrophy
of the ventriculus sinister," <u>not</u> DVT or pulmonary embolism.  Doc
#28, Exs D-E.  If the diagnosed cause of death was medically

<div style="text-align: left; writing-mode: vertical-rl;">**United States District Court**
For the Northern District of California</div>

<center>23</center>

related to DVT or pulmonary embolism, plaintiff utterly fails to establish this.

<p style="text-align:center;">D</p>

Plaintiff makes an FRCP 56(f) request for further discovery on his accident claims.  Doc #658 at 15-17; Doc #657 ¶¶13-14.  Specifically, plaintiff seeks discovery into "what type of turbulence was experienced on the subject flight" and "the conditions of the oxygenation and pressurization systems on board the subject flights and maintenance performed thereto."  Id.

The party seeking a Rule 56(f) continuance should demonstrate that: (1) it has set forth in affidavit form the specific facts that it hopes to elicit from further discovery; (2) the facts sought actually exist; and (3) these sought-after facts are essential to resist the summary judgment motion.  California v Campbell, 138 F3d 772, 779 (9th Cir 1998).  Whether to allow further discovery under Rule 56(f) is a subject committed to the district court's discretion.  Nidds v Schindler Elevator Corp, 113 F3d 912, 920 (9th Cir 1996).

Regarding discovery on turbulence, apart from inadmissible hearsay, plaintiff does not attempt to show a likelihood, as required by Rule 56(f), that evidence of unusual turbulence "actually" exists.  And as shown above, Delta has already produced evidence that the flight experienced the lowest grade of turbulence.  Doc #30.  Moreover, if plaintiff's theory is that turbulence forced Ms Braha to remain in her seat for periods of the flight, this evidence will not aid plaintiff in resisting Delta's summary judgment motion, as discussed above.

<p style="text-align:center;">24</p>

United States District Court
For the Northern District of California

Nor does plaintiff show how evidence of inadequate oxygenation/pressurization actually exists or how such evidence is essential to resist the summary judgment motion.  Indeed, Delta has already stated that it does not have documentation to indicate that anything was wrong with circulation of air or with pressurization in the cabin.  Doc #30 ¶¶7, 12, 15; Doc #29, ¶5.

It is unclear what evidence plaintiff now seeks and what purpose that evidence will serve.  In any event, further discovery into plaintiff's accident claim cannot overcome his failure to show that Ms Braha had a DVT or to show any other probative evidence of causation.  Accordingly, plaintiff's FRCP 56(f) request is DENIED

E

Accordingly, for all the above reasons, Delta's motion for summary judgment in 05-1544 is GRANTED.

IV
*Rietschel v US Airways, Inc, No 01-3444*

A
1

Ernst-Wilhelm Rietschel ("Rietschel") is a German national and a judge with the Labour Law Court of Appeals in Cologne.  Doc #55, ¶1; Doc #647, Ex C at 23:18-24:4.  On September 3, 2000, Rietschel was a fare-paying passenger on US Airways Flight 112 from San Francisco to Philadelphia and Flight 894 from Philadelphia to Frankfurt.  Doc #55 ¶7; Doc #647, Ex C at 84:5-9.  Rietschel was returning home with his wife following a visit with their daughter in the United States.  Doc #647, Ex C at 59:11-

25

60:10.  After boarding Flight 894 in Philadelphia to continue to Frankfurt, the plane was grounded for approximately two hours due to bad weather, during which time the passengers were kept seated without being offered drinks.  Doc #55 ¶7; Doc #647, Ex C at 99:17-100:25.  In total, Rietschel, who is over 6 feet tall, spent approximately 15 hours of his return trip onboard a plane.  Doc #55 ¶7; Doc #647, Ex C at 58:18-19, 87:1-3.

On September 6 or 7, 2000, Rietschel noticed swelling of his left calf.  Doc 647, Ex C at 118:2-10.  He subsequently developed a fever and called on a house doctor on September 8, 2000.  Doc #647, Ex C at 118:20-25.  The doctor instructed Rietschel to go to the hospital for his temperature and his leg. Id at 119:5-120:5.  Rietschel went to the hospital the next day, on September 9, 2000.  Id.  The hospital diagnosed Rietschel with a thrombosis, and gave him medicine to break a clot in his left calf. Id at 121:11-122:23.  The clot was four or five centimeters large. Id.  Rietschel remained in the hospital for 12 to 13 days and received treatment for several months.  Id; Doc #55 ¶14.

2

Rietschel filed a complaint against US Airways alleging that, after boarding the flight, he experienced "irregular altitude, inadequate air circulation and oxygenation, inadequate pressurization within the cabin due to a faulty and abnormal pressurization system(s), turbulence, cramped seating, inadequate hydration, and/or other unexpected and/or unusual factors * * *." Doc #55 ¶8.  Rietschel claims that "[a]s a direct, legal and proximate result" of these conditions, he developed DVT.  Id ¶14.

B

1

As in the other DVT cases, US Airways goes down the list of accidents alleged and argues that plaintiff does not have evidence to support the various claims in his complaint.  Doc #646 at 14-18.  In this case, Rietschel bases his accident claim on the two-hour delay, during which the flight from Philadelphia to Frankfurt was grounded before departing:

> Here, the claimed accident is delay and not the prolonged sitting. * * * While it is true that passengers are asked to stay seated during periods of delay, it is neither the prolonged sitting nor defective cramped seats that constitute the accident being claimed nor shall the court focus the injury producing inquiry on either of those two events.

Doc #665 (Opposition Br) at 11.

> It is the delay that is the link that constituted an accident. Regardless of the enormous passage of time since the subject flight took place, he did recall that the delay was unusual and it caused him (a link in the chain of causes) to remain seated longer that he would have been.  He testifies that during part of the flight, from Philadelphia to Frankfurt, there was an unusual delay which required him to stay seated an additional two hours due to bad weather condition. * * * Mr Rietschel testified that the delay was "unusual" and could have been avoided since they should have known that the flight would be delayed.

Id at 12-13.

The court takes issue with Rietschel's theory in two primary respects.  First no reasonable jury could find that a weather delay is an unusual or unexpected event in contemporary air travel.  See <u>Chendrimada v Air-India</u>, 802 F Supp 1089, 1093 (SDNY 1992) ("Meteorological conditions cannot be considered an unusual or unexpected event in plane travel.")  Rietschel himself admitted in deposition that delays in air travel are a "reality."  Doc #647, Ex C at 105:307.

United States District Court
For the Northern District of California

Moreover, it appears that Rietschel, like plaintiff in the <u>Braha</u> action, is using an attenuated "link in the chain theory" to detour around authorities holding that prolonged sitting is not an Article 17 accident.  As explained above in section III B 3, this misapplies the <u>Saks</u> "link in the chain" language.  In <u>Margrave v British Airways</u>, 643 F Supp 510 (SDNY 1986), the court held that a passenger who allegedly sustained injuries as the result of being forced to remain seated in a "cramped position" during a flight delay caused by a bomb threat had not suffered an accident within the meaning of Article 17.  Rietschel's attempt to shift the focus here from the extended sitting to the delay does not work to distinguish <u>Margrave</u>.

The court finds, however, that the unique circumstances of the delay experienced on Rietschel's flight may be found, by a reasonable jury, to constitute an accident.  Rietschel testified in deposition to the following:

> Q: What problems did you have?
> A: Yes.  We were seated – we were brought in, we checked in, and we were seated, and we had to fix our ceinture, or what is it you make?
> Q: Seat belt?
> A: Seat belts, yes.  And we are supposed to start, and then the crew said we have to start to sit and we have to wait for some time because we couldn't start.  So, we were seated and – and then we are seated for two hours and nothing happened, and so only we could see outside.  There was a storm and it was very dark then.  I think it was afternoon and it seemed to be very dark, something like some storm or so.  So we couldn't start.
> Q: Are you suggesting that the departure of the flight from Philadelphia to Frankfurt was delayed due to weather?
> A: Yes.
> Q: Other than the fact that the departure of the flight was delayed due to weather, did you have any other problems with the flight or the flight crew?
> A: Yes.  I was angry because we were seated and I thought we could have been for longer time in the airport or sitting and going around instead of being seated and fixed with our seat belts for two hours and so, and we couldn't move anywhere.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**

For the Northern District of California

```
        Q: Did you ask during the time period of - let me finish my
    question before you answer it.  During the time period that
    you were delayed in the departure, did you ask whether you
    could leave your seat for any reason?
    A: I didn't ask, because we were said we have to be seated, we
    haven't to move, by the crew.

Doc #647, Ex C (Rietschel dep) at 99:17-100:25.

        Q: Other than your anger over the fact that the flight was
    delayed due to weather and you were in your seat for two hours
    prior to departure, did you have any other problems with the
    flight from Philadelphia to Frankfurt?
    A: Yes.  I would have had some drinks or so when we were
    seated there, but we didn't get any.
    Q: Did you ask for anything?
    A: No.
    * * *
    A: You see, I didn't make any - I didn't ask them for
    something because the - you have to speak English then and
    it's difficult to explain if you have some problem, and I
    thought I will get through this without asking.  But I was
    angry about not having drinks and so, but all the people
    around me, they had the same problem, I think.  My wife, too.

Id at 101:8-16; 102:5-12.

        Q: Did anyone ever prevent you from getting out of your seat
    during the flight from Philadelphia to Frankfurt?
    A: I didn't try it, because we were said from the crew to be
    resting, to be seated, not to stand up and go around.
    Q: Did anyone ever tell you, though, that you could not get
    out of your seat?
    A: Yes.  I was said about the crew said you have to wait till
    we are - we take off.

Id at 132:4-13.
```

US Airways does not contradict this testimony.  And US Airways admits that the flight had a two-hour delay before takeoff, due to weather.  Doc #670 at 6.  While the weather conditions alone cannot be considered an unusual or unexpected event, a reasonable jury could find that the events surrounding the delay, specifically the alleged two-hour confinement without water, constitute an accident.  See Chendrimada, 802 F Supp at 1093 ("Clearly, while it is not unusual for weather conditions to cause aircraft to be grounded for many hours or flights cancelled altogether, it is

29

United States District Court
For the Northern District of California

highly unusual to be required to stay on board a grounded plane for 11 hours.")  US Airways argues that "*having* to sit for long periods of time during air travel does not qualify as an 'accident.'"  Doc #646 at 5 (emphasis added).  But US Airways has made no showing here that it was necessary for the passengers to remain seated (i e that they "had to"), for two hours while the plane was grounded and experiencing a weather delay.

     The court notes that the foregoing discussion would appear to allow recovery for some claims of prolonged sitting but not others.  Admittedly, the <u>Saks</u> definition of "accident" raises line-drawing questions that are by no means easy to resolve.  But there are differences among: (1) prolonged sitting that includes periods of mobility in which passengers may use the lavatory or stretch; (2) prolonged sitting that precludes any mobility due to safety risks such as turbulence or bomb threats (as in <u>Margrave</u>) and (3) prolonged sitting precluding mobility as directed by the flight crew for other reasons or, as may be the case here, for no apparent reason at all.  The first two are not so "unusual or unexpected" in international air transportation as to constitute an "accident."  The third category, after assessment "of all the circumstances surrounding a passenger's injuries," may or may not constitute an accident.  Wholesale preclusion of recovery for injuries arising from cases in the third category would give airlines *cart blanche* to force passengers to remain seated without reason.  This is untenable, and the court does not read those cases that address prolonged sitting to go so far.  See <u>Margrave v British Airways</u>, 643 F Supp 510, 512 (SDNY 1986); <u>Scherer v Pan Am</u>,

United States District Court
For the Northern District of California

54 AD 2d 636, 387 NYS 2d 580 (1st Dept 1976); <u>Toteja v British Airways</u>, 1999 US Dist LEXIS 17374 (D Md 1999).

Accordingly, the court will delete the following language from its July 10, 2007 order in the <u>Halterman</u> case, at 19:4-12:

> [T]he court follows the holdings of other courts in concluding that having to sit for long periods of times does not qualify as a Warsaw "accident." <u>Margrave v British Airways</u>, 643 F Supp 510, 512 (SDNY 1986)("extended sitting in an airplane, even in an uncomfortable position, cannot properly be characterized as the sort of 'accident' that triggers an airline's liability under the Warsaw Convention."); see also <u>Scherer v Pan Am</u>, 54 AD 2d 636, 387 NYS 2d 580 (1st Dept 1976); <u>Toteja v British Airways</u>, 1999 US Dist LEXIS 17374 (D Md 1999).

Based on the foregoing, the court offers the following clarification:

> Forced prolonged sitting may qualify as an accident depending on the surrounding circumstances. But prolonged sitting does not become an accident simply because it is a "link in the chain" of causation. This impermissibly conflates the accident inquiry with the causation inquiry.

2

US Airways next argues that Rietschel cannot prove that the two-hour delay caused his DVT. Doc #646 at 12. The court disagrees. As shown above, Rietschel noticed swelling in his leg two or three days after his flight and was diagnosed with a four to five centimeter blood clot soon thereafter. John H Scurr, M D, an expert in DVT has previously submitted a declaration in this litigation stating that "pressure of the back of the calfs [sic] and back of the knee from seats has also been implicated in the development of deep vein thrombosis." Doc #359 ¶10. Based on this evidence, a reasonable jury could find that the two-hour confinement was a link in the causal chain leading to Rietschel's injury. As Rietschel points out, the injury does not have to take

place during the flight.  An airline can be liable for a
passenger's delayed reaction to an accident.  See Prescod v AMR,
Inc, 383 F3d 861, 869 (9th Cir 2004).

<center>C</center>

Accordingly, for the above reasons, US Airways' motion
for summary judgment in 01-3444 is DENIED.

<center>V</center>

<center><em>Bianchetti v Delta Airlines, Inc</em>, No 04-4860</center>

This case is brought by Mike Bianchetti ("Mike")
individually and on behalf of his wife's estate.  Mike Bianchetti's
wife, Mary Bianchetti ("Mary"), died on December 9, 2002 at the
South Fulton Hospital in Atlanta, Georgia after falling ill while a
passenger on Delta Flight 11 from London to Atlanta.  The couple's
two sons, Christopher and Brian Bianchetti are also plaintiffs in
this action.  Mike, Christopher and Brian Bianchetti are
collectively referred to herein as "the Bianchettis."

<center>A</center>

On December 9, 2002, Mike and Mary Bianchetti were
passengers on Delta Flight 11 from London to Atlanta.  Doc #39, Ex
A.  Mary was 46-years-old at the time.  Id, Ex F.  Sometime before
1:15pm, Mary rose from her seat to use the bathroom. Doc #39, Ex B
(Mike dep) at 100:9-19.  As she stood up, she told Mike, "I'm
feeling a little dizzy."  Id at 100:4-22.  On her way to the
restroom, Mary collapsed in the aisle.  Doc #40 ¶3.

The lead flight attendant, Christine Tepovich, first
learned of Mary's condition at approximately 1:15 to 1:20 when told
by another flight attendant.  Id ¶2.  After a member of the flight

<center>32</center>

United States District Court
For the Northern District of California

1  crew made an announcement seeking medical help, two passengers came

2  to Mary's assistance.  Id, ¶4.  One was Bob Killough, a physician's

3  assistant.  Id.  While Ms Tepovich refers to the other passenger as

4  a doctor, the actual identity of the second passenger is unknown.

5  Doc #54, Ex A at 4.

6          Mike heard the announcement for doctors over the intercom

7  but was not aware at first that the person needing medical

8  attention was his wife.  Doc #39, Ex B at 101:20-25, 102:1-4.

9  After a short period of time, when Mary did not return to her seat,

10 Mike looked down the aisle and "saw her shoes."  Id at 102:1-103:3.

11         When Mike reached his wife, she was conscious and able to

12 speak but told Mike and the two assisting passengers that she was

13 having great difficulty breathing.  Id at 104-105.  Mike told the

14 assisting passengers that Mary had asthma.  One of the passengers

15 thought Mary was having an asthmatic attack.  Id.  The other

16 passenger felt under Mary's calves close to her knees and explained

17 that he thought she had a blood clot.  Id.  Mike testified in

18 deposition as follows:

19     Q: And then what – she said she was having a hard time
       breathing.  And then what happened?
20     A: Well, they were – they were – one guy was looking – was
       looking at her, thinking – thinking, you know, it was an
21     asthmatic attack.  And he wanted to give her her inhalers.
       And somewhere in that blur of time, the other – the one that
22     was down by her feet grabbed her under her – under her calves
       by her knees and at that point told me that he thought that
23     she had a blood clot.
       * * *
24     Q: Now, you said that the gentleman who was by her feet
       grabbed onto her calf by her knees and told you that she –
25     that he thought she had a blood clot?
       A: uh-huh (affirmative response).
26     Q: "Yes"?
       A: Yes.
27     Q: At what point was that in, say, with relation to the time
       that you first got to your wife?
28     A: It wasn't – not too long afterwards.  And I'm not going to

United States District Court
For the Northern District of California

1
2
3
4
5

> be able to tell you in minutes how long it was, but it was –
> it was relatively soon when they were looking to find what
> potentially was wrong with her.
> Q: Did the person say why he thought that?
> A: He – what I remember is he said that because when he put
> pressure behind her legs and that, that – he really didn't
> explain to me why he thought that other than he told me, you
> know, when he grabbed her calves that he could tell.

6
7
8

Id at 105:14-15, 106:21-107:20.  It is unclear if the person who
identified the blood clot was Mr Killough, the physician's
assistant, or the other assisting passenger.

9
10
11
12
13
14

        When the inhaler did not seem to have any effect, Mike,
the assisting passengers and the flight attendants elevated Mary's
legs and tried to keep her calm.  Id at 109-115.  Mike recalled
that a flight attendant brought over some medical equipment, which
the assisting passengers used to monitor Mary's pulse, blood
pressure and temperature.  Id.

15
16
17
18
19
20
21
22
23
24
25

        Ms Tepovich called the University of Pittsburgh Medical
Center ("UPMC"), the ground service that Delta contracts with for
advice during medical emergencies.  Doc #40 ¶5; Doc #54, Ex D.  Mr
Killough spoke to the doctor assisting Delta on the ground, Dr
McCausland.  Doc #40 ¶5; Doc #54, Ex B.  Dr McCausland's notes of
the consultation record that Mary had pain in both legs and then in
the left leg only.  Doc #54, Ex B.  Dr McCausland's notes also
indicate that Mary was in and out of consciousness and felt
uncomfortable in her chest.  Id.  Dr McCausland advised the
passengers to give Mary aspirin ("ASA") and albuterol, which were
administered.  Id; Doc #40, Ex A.

26
27
28

        During this time, Ms Tepovich kept the captain advised of
the situation.  Doc #40 ¶6.  The captain informed her that he could
declare a medical emergency, which would enable him to land in

1  Atlanta in 25-30 minutes.  Id.  The captain directed Ms Tepovich to
2  ask the assisting doctor whether that was acceptable.  Id.  An
3  assisting passenger said that was fine, and the decision was made
4  to continue to Atlanta.  Id; Doc #39, Ex B at 112:9-15; Doc #39, Ex
5  E.

6          The captain received an emergency clearance and proceeded
7  at higher than normal airspeeds.  Doc #39, Ex E; Doc #39, Ex B at
8  116:17-21.  Flight 11 landed in Atlanta at 1:50pm.  Doc 57 ¶3.  The
9  plane taxied for three minutes and then had to wait another three
10 minutes for a "block-in crew."  Doc #39 Ex E; Doc #57 ¶3.  Flight
11 11 arrived at the gate in Atlanta at 1:56pm – four minutes ahead of
12 the scheduled 2:00pm arrival time.  Doc #41 ¶6; Doc #40 ¶11.
13 Accordingly, the total time that elapsed between the decision to
14 continue to Atlanta and the arrival at the gate was 29 minutes.
15 Doc #57 ¶3.  Excluding the three minute of taxi time and three
16 minutes of waiting at the gate, there were 23 minutes of actual
17 flying time from decision point to landing in Atlanta.  Id.

18         After the plane reached the gate, EMS paramedics from the
19 Atlanta Fire Department boarded.  Doc #39, Ex B at 117-118; Doc
20 #54, Ex E.  They began evaluating Mary and treating her for asthma,
21 using a mask to administer oxygen.  Doc #39, Ex B at 118-119.
22 After about 20 minutes of attempted treatment, the paramedics asked
23 Ms Tepovich for the plane's medical kit in order to give Mary
24 epinephrine.  Doc #40, Ex A.  They also asked for a second oxygen
25 bottle.  Id.  Eventually, the paramedics indicated that they wanted
26 Mike to help prop Mary's back up so they could use the inhaler.
27 Doc #39, Ex B at 120.  When Mike did this, Mary stopped breathing –
28 prompting Mike and the paramedics to perform CPR.  Id at 120-121.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

The paramedics also tried using "a blue resuscitation bag" and tried to insert a breathing tube into Mary's mouth.  Doc #40 Ex A.

As paramedics continued trying to resuscitate Mary, Mike was guided away.  Doc #39, Ex B at 121-122.  The paramedics then transferred Mary to an ambulance parked outside the plane, and Mike traveled with them to the South Fulton Hospital in Atlanta.  Id at 123-124.  Mary reached the hospital at 3:15pm.  Doc #54, Ex E.  She was pronounced dead at 3:21pm.  Doc #39, Ex F.  Mary's death certificate identifies the immediate cause of death as "acute pulmonary thromboemboli."  Id.

**B**

The Bianchettis point to three possible Article 17 accidents: Delta's alleged failures to (1) divert the plane, (2) expedite care to Mary upon landing in Atlanta, and (3) ensure that appropriate personnel able to provide the correct care met the flight.  Doc #52 at 1.

**1**

The court first addresses the Bianchettis' argument that they suffered an "accident" when Delta decided not to divert the plane.  The Bianchettis point out that, in his report on the medical emergency, the plane's captain referred to the plane as "abeam" of the Cincinnati airport.  Doc #39, Ex E.  Accordingly, the crew had the choice of diverting the plane to Cincinnati or continuing to Atlanta.  Doc #52 at 5.  The Bianchettis submitted the declaration of Dr Stanley Ross Mohler, an expert in the subject of aerospace medicine and former president of the Aerospace Medical Association.  Doc #53.  Dr Mohler declares:

36

United States District Court

For the Northern District of California

> **While I cannot be sure of the precise location of the flight
> at this point, it appears clear that the nearest airport to
> Flight 11 when the emergency first occurred was the one in
> Cincinnati, which is a also a Delta hub airport.  Thus, I
> believe that the plane could have been landed more quickly,
> probably in a matter of a few minutes, in Cincinnati, than it
> could be landed after continuation to Atlanta.**

Id ¶11.

But as Delta points out, this opinion is based on speculation.  Doc #56 at 9.  Dr Mohler admits that he did not know the exact geographic location of Flight 11.  Nor does he establish how his expertise in aerospace medicine qualifies him to opine on the comparative landing times for the nearest airports.  Moreover, as Delta points out, Dr Mohler does not state whether the Cincinnati airport was capable of accepting the plane and does not recognize that landing "in a matter of a few minutes" would have been impossible at the plane's altitude regardless of the plane's geographic location.  Id; Doc #57 ¶10.  Nor does Dr Mohler account for the fact that Flight 11 was at, or very near, the point at which the descent into Atlanta would have begun.  Id ¶5.

Delta secured the declaration of Jon Tovani, Delta's General Manager of Pilot Standards and a licensed Air Transport Pilot.  Doc #57.  Mr Tovani scientifically demonstrates that it would have taken longer (some 42 minutes) to reach the Cincinnati/Northern Kentucky Airport than to reach Atlanta's Hartsfield International Airport (23 minutes), even if the pilot had been able to obtain a direct clearance to Cincinnati.  Id. While the court won't go into the specifics of Mr Tovani's analysis, suffice it to say that Mr Tovani built a representational flight plan using the same routes, navigation systems, flight planning systems, aircraft and standards as those applied at the

United States District Court

For the Northern District of California

time Delta Flight 11 occurred in 2002.  Id.  Based on the geographic location and altitude of Flight 11 at the time Mary's medical situation became known, continuing to Atlanta created the shortest possible flight time.  Id.

Based on Delta's evidence, and the lack of foundation for Dr Mohler's opinion that the plane could have landed more quickly in Cincinnati, the court finds as a matter of law that Delta's decision not to divert Flight 11 is not an Article 17 accident.

2

The Bianchettis' other arguments focus on Delta's alleged failure to ensure that medical personnel ready and able to treat DVT met the flight and immediately began treating Mary.  Doc #52 at 1.

First, the Bianchettis point out that Delta failed to alert the ground crew to the fact that one of the assisting passengers, after feeling under Mary's knees, stated that Mary had a blood clot.  Doc #52 at 22-24.  The EMS report states:

> Person on flight exp breath diff.  Female patient c/o diff breathing - husband states that approx 1 hour prior to landing patient stated she was dizzy and attempted to go to restroom - husband states that when she stood up to go to restroom she collapsed and started c/o breath diff.  Doctor on board gave patient some puffed from inhaler * * * While assessing patient - note a need for breathing treatment, after two treatment patient stopped breathing and CPR was initiated.

Doc #54, Ex E.  There is no indication that the EMS medical personnel knew that Mary had been identified as having a blood clot.  And Delta does not contend that it alerted the medical support awaiting the plane that a passenger had identified a clot as the likely source of Mary's medical problems.  Finally, the

\\

record shows that the EMS paramedics treated Mary for asthma, not for DVT.

The Bianchettis point out that Delta's flight operations manual directs the flight crew as follows: "When medical assistance is required on landing, obtain and provide the Flight Control and/or the arrival station as much of the following information as possible * * * [T]he type of medical assistance required. If considered a life threatening situation, communicate this clearly to the dispatcher and/or the arrival station *to ensure appropriate medical personnel will meet the flight*." Doc #54, Ex C at DL000006 (emphasis added). Based on these facts, a reasonable jury could find that the behavior of the flight crew in responding to Mary's condition was "unusual or unexpected."

Regarding whether this failure was a possible cause of Mary's death, the Bianchettis and Dr Mohler point out that, had the paramedics known that Mary was suffering from DVT, they would have been ready and able to ensure that Mary received clot-busting drugs, such as Heparin. Doc #52 at 24; Doc #53 at ¶14. Instead the paramedics spent over 20 minutes treating Mary for asthma and additional time performing CPR and trying to resuscitate Mary before loading her into the ambulance. Dr Mohler states that "Heparin can be administered by nurses, physician assistants or medical doctors. Heparin works rapidly to begin dissolving blood clots. I believe that Heparin or streptokinase could have and should have been administered upon arrival if Delta's policies and procedures were followed and the appropriate medical personnel had been advised of [Mary's] blood clots and vital signs." Doc #43 ¶14. Dr Mohler opines that "[i]f Delta would have properly

United States District Court
For the Northern District of California

1  followed their policies and procedures, [Mary] would have timely

2  received proper medication and emergency room support and in

3  reasonable medical probability would have survived." Doc #53 ¶19.

4        Neither party speaks to whether the paramedics carried

5  Heparin, were permitted to administer Heparin or would have

6  administered Heparin. Nor do the parties address whether the two

7  assisting passengers remained onboard such that they could have

8  administered Heparin if it were brought by the paramedics. It

9  appears that Dr Mohler's opinion is that the paramedics should have

10 been advised of the blood clot so that they could have expedited

11 Mary's transport to the hospital where she would have received

12 Heparin. Drawing all reasonable inferences in favor of the non-

13 moving party, as the court must, the court cannot conclude as a

14 matter of law that Delta's failure to alert the ground crew to the

15 possibility that Mary had DVT was neither an Article 17 accident

16 nor a link in the causal chain leading to Mary's death.

17       The Bianchettis also point out a factual dispute in

18 Delta's efforts to expedite the paramedics' entry onboard following

19 landing in Atlanta. The Bianchetti point to the fact that there

20 was a six minute delay between landing in Atlanta and arriving at

21 the gate. Doc #52 at 21. As discussed above, this was comprised

22 of approximately three minutes of taxiing and three minutes waiting

23 for gate clearance. Delta argues that "there is no evidence either

24 that a de minimis, three minute wait was unusual or unexpected, or

25 that three minutes at that juncture (or any other) was of any

26 causal significance." Doc #55 at 5. But Delta bears the burden of

27 proof on this motion. Delta does not directly address whether a

28 delay of this duration was normal procedure in an emergency medical

United States District Court
For the Northern District of California

clearance.  Nor does Delta address whether this delay could have been avoided or whether the paramedics could have met the plane before it parked at the gate.

Moreover, there is a factual dispute when the paramedics boarded the plane.  Ms Tepovich states the following in her declaration:

> When the aircraft arrived at the gate in Atlanta, the paramedics were already there waiting.  So they could get quick access to Ms Bianchetti, the passengers were instructed to deplane by using the aisle on the right side of the aircraft.  The paramedics quickly boarded through the 2L boarding door, on the left side of the plane.

Doc #40 ¶9.

Mike contradicts this version of facts in his deposition testimony, where he recalled that the paramedics did not board the plane and reach his wife until the other passengers deplaned:

> Q: And what happened at that point when you – you were on the ground –
> A: They deplaned everybody.  All the passengers got off.
> Q: And what happened next?
> A: After everybody got off, then the EMS came on.
> Q: So the EMS came on only after all the passengers were off?
> A: That's what I remember.
> Q: Were the crew members still on?
> A: I do not know.  There was some flight attendants on.  If that's considered part of the crew.
> Q: And then when the EMS – do you know about how long it was from the time that you landed until the EMS came on?
> A: Exact time, no.  I – whatever time it took to deplane the whole plane and get everybody out.  And then after everything was empty, they came on.  So 10, 15, 20 minutes.  It's just a guess.

Doc #39, Ex B at 117:13-118:9.

In its reply, Delta points out that the paramedics' notes show that the first assessment of Mary's vital signs occurred at 1:55pm.  Doc #54-8, Ex E at 13; Doc #55 at 6.  It may be difficult for Mike to refute this evidence at trial based only on his memory of events during a very heightened emotional state.  But the court

41

**United States District Court**
For the Northern District of California

cannot make credibility determinations on summary judgment.  <u>United States v Two Tracts of Land in Cascade County, Mont</u>, 5 F3d 1360, 1362 (9th Cir 1993).  Moreover, a jury could discredit the EMS report given that the plane did not reach the gate until 1:56.

Based on the above, a reasonable jury could find that Delta's response to Mary's condition constitutes an Article 17 accident that was in part attributable to Mary's death.

C

Delta argues that the Bianchettis' claims are improper because they are "in the nature of negligence-based complaints." Doc #38 at 14.  This seems beside the point.  The Bianchettis do not bring a cause of action for negligence.  This case is brought under the Warsaw Convention.  Accordingly, the only question is whether an unusual or unexpected event formed a link in the chain causing injury – not whether Delta injured Mary by breaching a duty owed to her or by acting "unreasonably."  "The negligent failure of the flight crew to appropriately serve the needs of an ailing passenger can be considered an 'accident' under the Convention." <u>Husain v Olympic Airways</u>, 116 F Supp 2d 1121, 1131 (ND Cal 2000) (citing <u>Fishman v Delta Air Lines, Inc</u>, 132 F3d 138, 142 (2d Cir 1998)).  See also <u>Fulop v Malev Hungarian Airlines</u>, 175 F Supp 2d 651, 671 (SDNY 2001) ("Whether in the final analysis the flight crew's acts under these circumstances were culpably negligent is beside the point.  What does matter, in this Court's view, is that the Flight and the air carrier's operation were not routine or normal in the sense that they allegedly deviated from compliance with expected procedures.")

United States District Court
For the Northern District of California

1

2          The Bianchettis point out, and Delta does not dispute,

3   that numerous courts have held that failures in responding to a

4   passenger's illness may state an Article 17 claim.  See Fulop,

5   supra (finding triable issue existed whether airline's failure to

6   divert plane in response to passenger's heart attack constituted an

7   accident); Gupta v Austrian Airlines, 211 F Supp 2d 1078 (ND Ill

8   2002) (same); Seguritan v Northwest Airlines, Inc, 86 AD 2d 658,

9   446 NYS 2d 397 (NY App Div 1982) (same); McCaskey v Continental

10  Airlines, Inc, 159 F Supp 2d 562 (SD Tex 2001) (failure to divert

11  plane in response to passenger's stroke); Husain, supra (failure to

12  reseat passenger experiencing breathing trouble from ambient

13  smoke); Turturro v Continental Airlines, 128 F Supp 2d 170 (SDNY

14  2001) (failure to permit passenger with anxiety attack from

15  disembarking before plane had pulled back from departure gate);

16  Cheng v United Airlines, Inc, No 93 C 149, 1995 WL 42157 (ND Ill

17  Jan 31, 1995) (flight attendant's failure to provide adequate first

18  aid when passenger was unconscious and bleeding).

19                                    D

20          Accordingly, for the above reasons, Delta's motion for

21  summary judgment in 04-4860 is DENIED.

22  \\

23  \\

24  \\

25  \\

26  \\

27

28

United States District Court
For the Northern District of California

VI

***Halterman v Delta Airlines, Inc, Qantas Airways, Limited, and
Skywest, Inc*, *No 04-3953***

A

As mentioned above, the court granted Qantas' motion for summary judgment in Case No 04-3953 on July 10, 2007.  Doc #41. The order seems to have created some confusion over the scope of discovery allowed to plaintiffs in this MDL.  In the order the court denied Halterman's FRCP 56(f) request stating, in part:

> Moreover, Halterman has had ample opportunity to pursue discovery relating to his theory of the case.  Counsel for Qantas represents that Halterman has never served an interrogatory requesting that Qantas identify the flight crew of QF94 and that Halterman never noticed depositions of the flight crew.  Doc #39 at 17.  Halterman submits copies of his interrogatories and requests for production (doc #616, exs A-D), which confirm that Halterman propounded minimal discovery. Finally, as noted above, Halterman has never made a motion to compel or motion for continuance to conduct further discovery.

Doc #41 at 22:27-23:8.

Counsel for Halterman promptly filed a motion for clarification of the court's denial of Halterman's FRCP 56(f) request.  Doc #629.  Counsel reminded the court that plaintiffs' discovery had been limited and specifically, that the court had denied plaintiffs' requests to depose flight crew.  Id.  The court entered an order on the motion for clarification stating that Halterman's FRCP 56(f) request was denied because Halterman failed to comply with FRCP 56(f).  Doc #638.  Plaintiffs' counsel is correct, however, that plaintiffs have not had an opportunity to conduct the full panoply of discovery.  The Halterman order was not intended to lift the partial discovery stay.  In order to avoid further confusion, the court will strike the language in the

44

**United States District Court**
For the Northern District of California

Halterman order at page 22, line 27 through page 23, line 8.  The
court will enter an amended order to reflect this change as well as
the change noted above in section IV B 1.  These changes do not
alter the court's ruling in Halterman, No 04-3953.

B

Lastly, the court addresses Halterman's objections to
Qantas' bill of costs.  Doc ##48, 49.  Qantas filed a bill of costs
seeking to recover $796.98 incurred in taking Halterman's
deposition.  Of this amount, $315 was incurred for videotaping the
deposition.  The remainder represents transcription costs.
Halterman objects to recovery of both videotaping costs and
transcription costs.  Civ LR 54-3(c)(1) provides that prevailing
parties are entitled to "the cost of an original and one copy of
any deposition (including video taped deposition) taken for any
purpose in connection with the case."  Admittedly, the phrasing of
this rule is vague as to what expenses associated with videotaped
depositions are recoverable.  The court concludes, however, that a
sensible reading of the rule covers the cost of videotaping *and* the
cost incurred by the court reporter associated with obtaining a
stenographic transcription of a deposition, as well as the cost of
one copy of the videotape and of the written transcript.
Accordingly, the clerk is DIRECTED to tax Qantas' bill of costs in
the amount of $796.98.

\\

\\

\\

**United States District Court**
For the Northern District of California

# VII

For the reasons detailed above, defendant Delta Airlines, Inc's motion for summary judgment in 05-1544 (Braha) is GRANTED. The clerk is DIRECTED to enter judgment in favor of Delta and is further DIRECTED to close the file, terminate all motions and enter judgment in 05-1544.

Defendant Singapore Airlines, Inc's motion for summary judgment in 03-1929 (Dabulis), defendant US Airways, Inc's motion for summary judgment in 01-3444 (Rietschel), and defendant Delta Airlines, Inc's motion for summary judgment in 04-4860 (Bianchetti) are DENIED.  Case No 04-4860 (Bianchetti) is REFERRED to the Judicial Panel on Multidistrict Litigation for remand to the Northern District of Georgia.  See 28 USC § 1407(a); <u>Lexecon Inc v Milberg Weiss</u>, 523 US 26 (1998).  The clerk is DIRECTED to transmit the file forthwith.

Case numbers 01-3444 (Rietschel) and 03-1929 (Dabulis) were originally filed in this court.  Accordingly, the parties will receive a pretrial conference date following the court's summary judgment ruling in the two cases remaining in this MDL: No 04-3831 (Richelet) and 07-1604 (Vincent).

\\

\\

\\

\\

\\

46

**United States District Court**
For the Northern District of California

1   The clerk is **DIRECTED** to tax Qantas' bill of costs in the

2   amount of $796.98 in 04-3953 (Halterman).

3   Docket numbers 589, 592, and 629 in MDL 04-1606 are

4   terminated as an administrative matter.

5

6

7   SO ORDERED.

8

9

10

11   _____

12   VAUGHN R WALKER
     United States District Chief Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

47